IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

EDWARD FRANK BREWER and
ROSINA ORLANTHA RHODES,

    Defendants.

No. CR08-0067

REPORT AND RECOMMENDATION

———————————

## TABLE OF CONTENTS

I.    *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL HISTORY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    *ISSUES PRESENTED*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.    *RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.    *September 19, 2008*. . . . . . . . . . . . . . . . . . . . . . . . 3
    B.    *September 23, 2008*. . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *September 30, 2008*. . . . . . . . . . . . . . . . . . . . . . . . 5
    D.    *October 9, 2008*. . . . . . . . . . . . . . . . . . . . . . . . . . 5
        1.    *The Arrest*. . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.    *The Interview*. . . . . . . . . . . . . . . . . . . . . . . . 7

V.    *DISCUSSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    A.    *Brewer's Motion to Suppress*. . . . . . . . . . . . . . . . . . . . 9
        1.    *Was Brewer's Traffic Stop Improperly Extended?*. . . . . . . . 9
        2.    *Was Brewer Improperly Searched?*. . . . . . . . . . . . . . . 11
    B.    *Rhodes' Motion to Suppress*. . . . . . . . . . . . . . . . . . . . 12
        1.    *Was There Probable Cause to Arrest Rhodes?*. . . . . . . . . 12
        2.    *Were Rhodes' Statements Made Voluntarily?*. . . . . . . . . . 16

VI.    *SUMMARY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VII.    *RECOMMENDATION*. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I. INTRODUCTION

On the 29th day of December 2008, this matter came on for hearing on the Motion to Suppress (docket number 40) filed by Defendant Edward Frank Brewer on December 12, 2008 and the Motion to Suppress (docket number 46) filed by Defendant Rosina Orlantha Rhodes on December 16, 2008. The government was represented by Assistant United States Attorney Stephanie M. Rose. Defendant Edward Frank Brewer was present and represented by his attorney, Leslie E. Stokke. Defendant Rosina Orlantha Rhodes was also present and represented by her attorney, Webb L. Wassmer.

## II. PROCEDURAL HISTORY

On October 21, 2008, Edward Frank Brewer was charged by Indictment (docket number 1) with three counts of distribution of crack cocaine and one count of possession with intent to distribute crack cocaine. Brewer entered a plea of not guilty and trial was scheduled for December 22, 2008.

On November 18, 2008, a Grand Jury returned a Superseding Indictment (docket number 13) adding Rosina Orlantha Rhodes as an additional Defendant. A new Count 1 was added, charging Brewer and Rhodes with conspiracy to distribute crack cocaine. Trial is scheduled for January 20, 2009. On Brewer's uncontested motion to continue, his trial was rescheduled for the same date.

On December 12, Brewer timely filed his instant motion to suppress. On December 16, Rhodes timely filed her motion to suppress.

## III. ISSUES PRESENTED

Brewer claims that his constitutional rights were violated by a search of his person during a traffic stop on September 19, 2008. Brewer asks that the Court enter an order suppressing "all evidence know [sic] to the government as a result, direct or indirect, of said stop, search and seizure."

Rhodes claims that she was arrested on October 9, 2008 without probable cause and that her subsequent statements while in custody were not voluntary. Rhodes asks that the

Court suppress "all statements made by Ms. Rhodes after her arrest, the firearm and other evidence found during the search of Ms. Rhodes' vehicle and all evidence found during the search of Ms. Rhodes' apartment."

## IV. RELEVANT FACTS

The charges set forth in the Superseding Indictment arise from four separate incidents in September and October of 2008.

### A. September 19, 2008

Special Agent Dustin Wernli ("SA Wernli") of the Drug Enforcement Agency testified regarding a controlled buy of crack cocaine on September 19, 2008. An undercover officer ("UC") and a confidential informant ("CI") made arrangements to meet with Brewer to purchase crack cocaine. The transaction occurred on the ground level of a two-story parking lot (referred to as a "parkade") adjacent to Lindale Mall in Cedar Rapids. Special Agent Wernli observed Brewer get out of a white van, "embrace" or give a "half-hug" to the CI, talk briefly, and then get back in his van and depart the area. SA Wernli did not see the actual transfer of drugs or money. The UC accompanied the CI to the meeting, but did not exit the vehicle. Also providing surveillance at the transaction were Task Force Officers Nathan Juilfs and Dale Moyle ("TFO Juilfs" and "TFO Moyle").

Special Agent Steven Warner ("SA Warner") testified that shortly after the transaction, the CI told officers that the CI felt what the CI believed to be a handgun when the CI hugged Brewer. As officers continued to surveil Brewer, he stopped at a car dealership and went to an apartment complex. Because of concerns regarding a possible handgun, it was decided to conduct a traffic stop on Brewer. The traffic stop occurred approximately 50 minutes after the transaction at Lindale Mall.

Officer Jeff Herbert of the Cedar Rapids Police Department testified that he was contacted and instructed to pull over the van Brewer was driving. Officer Herbert verified that Brewer did not have a valid driver's license. According to Officer Herbert, Brewer

drove seven blocks after Herbert activated his lights before stopping. Herbert also had his siren operating during the last five blocks. Police investigators were on the scene, "along with probably two more patrol cars."

Because of concerns regarding a handgun, Brewer (who was driving) and a Black male passenger were ordered at gunpoint to exit the vehicle one at a time and walk back toward the officers. According to Officer Herbert, "Mr. Brewer didn't make it all the way back to us before he laid down on the ground at which point an officer had to walk up to him and handcuff him and take him into custody at that point." Brewer was arrested and charged with driving under suspension and failing to yield.

No firearm was found. Inside the van, however, Officers found $800 of pre-serialized money that was used during the controlled buy at Lindale Mall approximately one hour earlier. (In his brief, Brewer states that the money was taken from his pants pocket. The testimony at the hearing suggested, however, that it was found in the van.) The van was towed from the scene.

Rhodes appeared on the scene shortly after Brewer was taken into custody. Rhodes was the owner of the van and wanted to show officers a bill of sale for the van and a proof of insurance card. While the testimony was somewhat imprecise, Brewer was apparently stopped near the apartment building where Rhodes and Brewer resided.[1]

### B. September 23, 2008

On September 23, 2008, the same undercover officer ("UC") who was involved in the September 19 transaction arranged for another purchase of crack cocaine from Brewer. The UC was instructed by Brewer to leave the money under a rock near a Burger King cup in the parkade at Lindale Mall. The UC left the money as instructed and retrieved a Burger King cup containing crack cocaine.

---

[1] During an interview with SA Wernli and TFO Moyle on October 9, 2008, Rhodes stated that Brewer is the father of one of her children and they lived together in an apartment on Oakland Road.

TFO Moyle testified that shortly before the exchange, he saw Rhodes driving a car in the area, with Brewer as a passenger. According to TFO Moyle, the car went into the Burger King parking area (near the parkade), where he saw the driver's side door open and Rhodes pick up a cup. He could not see the markings on the cup. SA Warner testified that he also saw Rhodes pick something up in the Burger King parking lot, although from his angle, he could not tell what it was. Although officers continued to surveil Rhodes and Brewer the "majority" of the time, none of the officers saw who placed the Burger King cup in the parkade where the exchange occurred, and none of the officers saw who picked up the money after the exchange.

### C. September 30, 2008

SA Wernli testified regarding another hand-to-hand transaction which occurred on September 30, 2008. Brewer got in the UC's vehicle near the Tan Tara apartments to conduct the transaction with the CI. A series of recorded phone calls were made in setting up the purchase on September 30. A female voice could be heard in the background giving Brewer "some sort of directions."

According to SA Wernli, surveillance officers saw Rhodes drop off Brewer prior to the transaction and pick him up afterward. Officer Wernli testified that he observed Rhodes driving erratically following the transaction, including making a U-turn in the middle of the street, in an apparent attempt to determine if she and Brewer were being followed.

### D. October 9, 2008

#### 1. The Arrest

The undercover officer arranged to purchase three ounces of crack cocaine from Brewer on October 9. Brewer and the UC agreed to meet in the parking lot near Sears, on the east end of Lindale Plaza. Agent Greg Brugman was parked near the parkade on the west end of Lindale Mall. At approximately 11:20 a.m., Agent Brugman advised other surveillance officers that he observed a car and driver matching Rhodes' description in the

Pizza Hut parking lot near the parkade. Rhodes then drove from the Pizza Hut parking lot and parked on the ground floor of the parkade. At about 11:50 a.m., Agent Brugman observed Brewer drive up in a red Lincoln and stop next to the car being driven by Rhodes. They appeared to talk briefly and Brewer then drove off.

Shortly after that time, Brewer pulled up next to the UC's car at the other end of Lindale Mall. Brewer got in with the UC, turned up the radio, and whispered in the UC's ear. Brewer also pulled his hooded sweatshirt over his face and appeared to be talking in a Bluetooth cellular telephone.

At Brewer's direction, the UC drove around the mall to the area near the parkade. Brewer wanted the UC to pull into the parkade, but the UC refused due to safety concerns. Eventually, the UC drove back to the parking lot near Sears. Brewer was arrested after he left the UC's vehicle, at approximately 12:15 p.m.

As soon as Brewer was arrested, SA Wernli, TFO Moyle, and Agent Brugman approached Rhodes' car in the parkade with guns drawn. According to SA Wernli, the car had tinted windows and it was difficult to see inside. When Rhodes exited the vehicle, she was immediately asked whether there was anything "dangerous" in the car. Rhodes advised the officers that she had a handgun in the trunk. With Rhodes' consent, the trunk was opened and the handgun was removed. Rhodes had a permit to own the handgun and a trigger lock was found on the weapon.

When Rhodes told the officers that there was a gun in the car, she was placed in handcuffs before the gun was removed. After the gun was secured, however, the handcuffs were removed. Rhodes was then *Mirandized* and she gave oral and written permission to search her vehicle. *See* Government's Exhibit 1. A search of Rhodes' vehicle apparently did not reveal anything significant.

During questioning at the scene, Rhodes told officers that she had been there for ten minutes and had not seen Brewer recently.[2] Additional officers responded to the scene and a Kohl's bag containing approximately three ounces of crack cocaine was found in the parkade "within feet" of the area where the Burger King cup had been left two weeks earlier. The area where the drugs were found could be seen by Rhodes from where she had been sitting. None of the officers saw who placed the drugs. According to officers, Rhodes was placed under arrest at that time.

### 2. *The Interview*

Rhodes was then transported to the Cedar Rapids Police Department to be interviewed by SA Wernli and TFO Moyle. Rhodes expressed concern regarding her children and was allowed to use SA Wernli's cell phone to call her mother.[3] In the first call, at 12:37 p.m., Rhodes told her mom that her vehicle had broken down and asked that she pick up the kids from school. (The officers had apparently suggested that Rhodes not tell her mother about her arrest.)

Upon arriving at the police department, Rhodes was taken to an interview room and offered food and drink, but she declined. Officers read a *Miranda* warning to Rhodes and had her read it back to them. Rhodes then signed a Waiver of Rights (Government's Exhibit 3) and agreed to answer questions. The *Miranda* waiver was signed at approximately 1:00 p.m.

The officers advised Rhodes that they were conducting a federal narcotics investigation. She was told that it was a "significant case" and that she could be "looking at some time in federal prison" if she were convicted. Rhodes denied that she sold drugs, but admitted that she had been with Brewer on approximately five occasions when she

---

[2] SA Wernli testified that Rhodes said she saw Brewer earlier that morning, while TFO Moyle testified that Rhodes said she had last seen Brewer at noon on the previous day.

[3] According to TFO Moyle's report (Government's Exhibit 6), Rhodes has three children, ages 11, 5, and 3.

knew him to be selling drugs. According to SA Wernli's report (Government's Exhibit 5), Rhodes picked up Brewer on a street corner approximately two weeks earlier and transported him to another location in Cedar Rapids, where Brewer apparently sold crack cocaine to an unidentified white male. Rhodes recalled another incident, approximately one week earlier, when she drove Brewer to a Handimart for what she understood to be the sale of crack cocaine.

Rhodes also described an incident "near the end of September 2008," which is apparently the transaction which occurred on September 23, 2008. Rhodes said she drove Brewer to the Lindale Mall to conduct a crack cocaine transaction. According to Rhodes, Brewer gave directions to an unknown person while on his cellular phone. Rhodes stated that Brewer had placed a cup near one of the entrances to the parking area on the west end of the mall. Rhodes did not see crack cocaine in the cup, but "stated that she new [sic] this to be a crack cocaine transaction and believed that BREWER was directing someone to place U.S. currency near the area of where the cup was located."[4] Rhodes admitted that she drove Brewer back to the location of the cup and observed Brewer pick up a large amount of U.S. currency.

Describing the events of October 9, Rhodes told officers that she was instructed by Brewer to park under the parking ramp and stay there while he "made a run" to meet someone. Rhodes understood that to "make a run" meant to complete a drug transaction.

Rhodes told officers that she purchased the handgun in a pawn shop on September 16, 2008. According to Rhodes, Brewer went with her, gave her the money to purchase the weapon, and told her which weapon to buy. Rhodes and Brewer then went to Wal-Mart to purchase the ammunition. Brewer showed Rhodes how to load and operate the

---

[4] SA Wernli's Report of Investigation (Government's Exhibit 5), ¶ 9 at 4.

weapon. According to Rhodes, "she had been threatened lately and was having trouble with an ex-girlfriend of BREWERS and felt she needed the weapon as protection."[5]

At 3:02 p.m., Rhodes was permitted to call her mother again to confirm arrangements for picking up the children. Toward the end of the interview, Rhodes gave written consent to search her apartment. The written consent form (Government's Exhibit 4) was signed at 3:53 p.m. According to SA Wernli, a search of Rhodes' apartment revealed ammunition, a scale, and "some other items," but no crack cocaine. Rhodes was released from custody following a search of her apartment.

## V. DISCUSSION

### A. Brewer's Motion to Suppress

While not a model of clarity, Brewer appears to argue in his brief that the traffic stop was improperly extended and that the search was illegal.

### 1. Was Brewer's Traffic Stop Improperly Extended?

In his brief, Brewer states that he "was stopped by members of the Cedar Rapids Police Department for an alleged failure to have proper registration displayed."[6] Apparently, Rhodes had recently purchased the van. She appeared on the scene shortly after the stop and provided a bill of sale for the van and a proof of insurance card. There were license plates on the van, but they were registered to the previous owner. None of that was the reason, however, for stopping the vehicle. The van was stopped because Brewer was driving while his license was under suspension.

A traffic stop constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). If an officer observes a traffic violation, however, then he has probable cause to initiate a traffic stop "and such a stop comports with the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). *See also United States v.*

---

[5] *Id.*, ¶ 15 at 6.

[6] Brief in Support of Motion to Suppress (docket number 40-2) at 1.

*Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) ("It is well established that a traffic violation--however minor--creates probable cause to stop the driver of a vehicle."). Furthermore, "the stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008). That is, "[w]hether a traffic stop is appropriate is not affected by an officer's subjective motivations." *Id.*

Multiple officers observed Brewer driving the van immediately prior to the stop. It was verified that Brewer's driver's license was under suspension. Accordingly, the officers clearly had authority to conduct a traffic stop.

Brewer suggests in his brief, however, that "Cedar Rapids Police continued their interrogation and requested the Defendant exit the vehicle well past the point in which the stop should have ended."[7] "Generally, a stop should last no longer than is necessary to confirm or dispel the officer's suspicions." *Id.* In this case, officers conducted a "felony stop," requiring the occupants of the vehicle to exit at gunpoint. "During any investigative stop, 'officers may take steps reasonably necessary to protect their personal safety.'" *United States v. Bell*, 480 F.3d 860, 864 (8th Cir. 2007) (quoting *United States v. Shranklen*, 315 F.3d 959, 961 (8th Cir. 2003)).

Here, officers knew that Brewer had been involved in a hand-to-hand drug transaction less than one hour earlier. Immediately following the transaction, the CI reported to officers that the CI believed Brewer may be carrying a handgun. Brewer initially failed to yield to officers, continuing on for 5-7 blocks while being pursued with emergency lights on and siren wailing. Under these circumstances, the Court concludes that the officers reasonably took precautions associated with a "felony stop." *See Bell*, 480 F.3d at 864. There is no evidence that the stop was improperly extended.

---

[7] *Id.* at 2.

## 2. *Was Brewer Improperly Searched?*

In his brief, Brewer suggests that the $800 of pre-serialized money was taken from his pants pocket. Brewer does not argue that the officers could not conduct a pat-down search, *see,* e.g., United *States v. Davis*, 202 F.3d 1060, 1062 (8th Cir. 2000), but appears to argue that the search exceeded a permissible pat-down search "as no reasonable officer would have thought under the same circumstances that eight-one hundred dollar bills were a weapon of any type." A pat-down search must be limited in its scope.

> "Because safety is the sole justification for a pat-down search for weapons, only searches 'reasonably designed to discovery concealed weapons' are permissible. (citation omitted). An officer may, however, seize nonthreatening contraband detected during a pat-down search for weapons as long as the search itself 'stays within the bounds marked by *Terry.*'"

*United States v. Hanlon*, 401 F.3d 926, 930 (8th Cir. 2005) (referring to *Terry v. Ohio*, 392 U.S. 1 (1968)).

Brewer's argument fails, however, for two reasons. Factually, it is the Court's understanding that the money was not found during a search of Brewer's person, but rather it was found in the van. Legally, Brewer was arrested for driving under suspension and failing to yield. Accordingly, a search of his person was lawful as a search incident to arrest. "[A] lawful custodial arrest establishes authority to conduct a full search of the arrestee's person, and . . . such a search is 'not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.'" *United States v. Hrasky*, 453 F.3d 1099, 1101 (8th Cir. 2006) (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)).

The testimony at the hearing indicated that the money was found in the van. Brewer's brief in support of his motion to suppress does not address the validity of a search of the van. However, in *New York v. Belton*, 453 U.S. 454 (1981), the United States Supreme Court set forth a "bright-line" rule permitting warrantless vehicle searches incident to arrest.

> [W]e hold that when a policeman has made a lawful custodial
> arrest of the occupant of an automobile, he may, as a
> contemporaneous incident of that arrest, search the passenger
> compartment of that automobile.

*Id.* at 460. *See also United States v. Ball*, 499 F.3d 890, 896 (8th Cir. 2007); *United States v. Grooms*, 506 F.3d 1088, 1090-91 (8th Cir. 2007); and *Hrasky*, 453 F.3d at 1102 (search conducted more than one hour after the initial stop).

In summary, the Court concludes that Brewer was properly stopped for a traffic violation on September 19, 2008. Given his recent involvement in a drug transaction, a report that he may be armed, and his refusal to immediately yield to officers, law enforcement authorities reasonably used the special precautions associated with a felony stop. Brewer was then arrested for driving under suspension and failing to yield. A search of his person and the vehicle were conducted incident to his arrest. The searches did not violate the Fourth Amendment. Accordingly, the Court believes that Brewer's motion to suppress should be denied.

### B. Rhodes' Motion to Suppress

Rhodes claims that she was arrested without probable cause. Accordingly, she asks that all evidence obtained subsequent to her arrest be suppressed. Alternatively, Rhodes argues that her statements to the interrogating officers were not voluntary and, therefore, should be suppressed.

### 1. Was There Probable Cause to Arrest Rhodes?

Rhodes was arrested without a warrant in the parkade at the Lindale Mall on October 9, 2008. The law regarding warrantless arrests was summarized recently by the Eighth Circuit Court of Appeals as follows:

> The Fourth Amendment protects, "the right of the people to be
> secure in their persons, houses, papers, and effects, against
> unreasonable searches and seizures." "A warrantless arrest by
> a law officer is reasonable under the Fourth Amendment where
> there is probable cause to believe that a criminal offense has
> been or is being committed." Probable cause sufficient to

> make a warrantless arrest exists when "the facts and
> circumstances are sufficient to lead a reasonable person to
> believe that the defendant has committed or is committing an
> offense." A "probability or substantial chance of criminal
> activity, rather than an actual showing of criminal activity" is
> sufficient. "To determine whether an officer had probable
> cause to arrest an individual, we examine the events leading up
> to the arrest, and then decide whether these historical facts,
> viewed from the standpoint of an objectively reasonable police
> officer, amount to probable cause."

*United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008) (all citations omitted). Thus, the Court must review the totality of the circumstances preceding Rhodes' arrest to determine whether they would lead a reasonable person to believe that Rhodes was probably committing a crime.

Officers knew that on September 19, Brewer drove a van owned by Rhodes to the parkade at Lindale Mall in order to conduct a drug transaction. When Brewer was subsequently pulled over in a traffic stop, Rhodes appeared on the scene almost immediately.

On September 23, Rhodes was seen driving Brewer near the parkade at Lindale Mall for another drug transaction. Officers saw Rhodes reach down and pick up a cup in the Burger King parking lot. Pursuant to instructions given by Brewer, the undercover officer subsequently left money under a rock in the parkade and retrieved a Burger King cup containing crack cocaine.

On September 30, Rhodes was observed by officers dropping Brewer off prior to a hand-to-hand drug transaction, and picking him up afterward. During phone conversations to set up the buy, officers could hear a female voice giving Brewer directions. After the buy, Rhodes was observed driving erratically, as if to determine whether she and Brewer were being followed.

13

On October 9, Rhodes was observed driving from the Pizza Hut parking lot and then parking in the parkade at Lindale Mall. After she had been sitting there for some time, she was approached by Brewer in another vehicle. After speaking briefly with Rhodes, Brewer drove to the other end of the mall, where he met with the undercover officer. At Brewer's direction, the UC then drove to the area near the parkade. Brewer wanted the UC to drive into the ground level of the parkade, but the UC refused for security reasons. While this occurred, Rhodes continued to sit in her car on the ground level of the parkade for nearly an hour.

In support of her argument that probable cause for her arrest did not exist at that time, Rhodes cites *United States v. Everroad*, 704 F.2d 403 (8th Cir. 1983). There, a divided panel of the Eighth Circuit Court of Appeals concluded that the defendant's warrantless arrest was not supported by probable cause. According to the Court, the evidence revealed only "two basic facts" in support of the claim of probable cause. *Id.* at 406. First, the defendant was seen with another person whom agents knew was involved in a drug transaction; and second, the defendant was staying at a motel which was located within a 30-minute radius where the other person suggested the drugs could be found. In rejecting the district court's finding that probable cause existed for the defendant's arrest, the Court noted that "it is settled that mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest." *Id.* Furthermore, the Court found that "physical proximity to a crime" will not alone support a finding of probable cause. *Id.* at 407.

The Court believes that the facts in *Everroad* are distinguishable from the facts in the instant action. Everroad had no known involvement with the target individual prior to the day of the transaction. The evidence against Everroad was limited to him riding with the target individual past the parking lot where the transaction was to occur, and being in a motel within the area accessible to the target individual during a time period during which he said the drugs could be delivered.

In this case, however, Brewer had previously used a van owned by Rhodes to conduct a drug transaction in the parkade at Lindale Mall. On a later date, Rhodes was seen driving Brewer before and after a drug transaction in the parkade at Lindale Mall. Officers saw Rhodes pick up a cup from the Burger King parking lot and the drugs were subsequently found in a Burger King cup. On a third occasion, Rhodes was seen dropping off Brewer at a drug transaction and picking him up afterward. During a phone call setting up the transaction, a female voice could be heard in the background. Following the transaction, Rhodes was observed driving erratically, as if to avoid being followed. Shortly before her arrest on October 9, Rhodes was observed talking to Brewer. Brewer immediately drove to the other end of the mall to conduct a drug transaction. Rhodes remained seated in her car in the parkade while Brewer tried to persuade the UC to enter the parkade. Rhodes was seen with Brewer in the same area approximately two weeks earlier when Brewer and the UC exchanged drugs for money.

As the term suggests, "probable cause" deals with probabilities.

> "In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Probable cause exists where "the facts and circumstances within their (the arresting officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

*Draper v. United States*, 358 U.S. 307, 313 (1959) (all citations omitted).

The Court concludes that the totality of the circumstances, viewed from the standpoint of an objectively reasonable person, support a finding that Rhodes was acting in conjunction with Brewer in an attempt to distribute crack cocaine on October 9, 2008. Accordingly, probable cause existed for her arrest.

The parties dispute whether Rhodes was arrested immediately upon the officers approaching her vehicle in the parkade on October 9, or whether she was arrested following questioning at the scene, and the finding of the Kohl's bag containing crack cocaine in the area. I believe it is unnecessary to resolve that dispute. For the reasons set forth above, I believe that probable cause existed for Rhodes' arrest when the officers initially approached her vehicle. Subsequent events (Rhodes telling officers that she had been there for only ten minutes and had not seen Brewer recently, and the recovery of crack cocaine within "eyeshot" of Rhodes) simply added additional facts supporting probable cause. The Court believes, however, that those additional facts were not necessary for a probable cause determination.

### 2. Were Rhodes' Statements Made Voluntarily?

Next, Rhodes claims that the statements made by her during the interrogation at the police department "were not voluntary and were procured by the use of improper threats against Ms. Rhodes' children by the interrogating officers."[8] Rhodes argues that since her statements were not made voluntarily, they must be suppressed.

"A waiver of the Fifth Amendment privilege against self-incrimination is valid if the waiver is made voluntarily, knowingly and intelligently." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). The standard to be applied by the Court in determining whether a statement is made voluntarily was summarized in *United States v. LeBrun*, 363 F.3d 715 (8th Cir. 2004):

> "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."

> Whether a confession is involuntary is judged by the totality of the circumstances. The court must look at the "conduct of the officers and the characteristics of the accused." The

---

[8] Brief in Support of Motion to Suppress (docket number 46-2) at 11.

> government bears the burden of persuasion and must prove by
> a preponderance of the evidence that the challenged statements
> were voluntary.

*Id.* at 724 (internal citations omitted). *See also United States v. Hyles*, 479 F.3d 958, 966 (8th Cir. 2007).

In her brief, Rhodes claims that SA Wernli and TFO Moyle made various threats that her children "would be taken away from her." According to Rhodes, her will was overborne by the threats, rendering her subsequent admissions, and the written consent to search her apartment, involuntary. Rhodes' interrogation was not recorded and Rhodes did not testify, so the only account of the questioning is provided by the officers.[9]

SA Wernli testified that he advised Rhodes that this was a "substantial case" and that "if she was prosecuted and found guilty she could spend time in prison." Rhodes was told that "these type of charges could be punishable up to 20 years or more." SA Wernli did not tell Rhodes that she or anyone else would receive 20 years, but told her that "it's a possibility to receive that amount of time."

SA Wernli denied that he or TFO Moyle told Rhodes that if she went to prison, she would never see her kids again. He also denied that Rhodes was told that she would have to "figure out who would keep her kids while she's in prison." According to SA Wernli, Rhodes asked the officers several times "what will happen to my children" and indicated that "I'm concerned about my children." According to SA Wernli, the officers responded:

> We explained to her how the federal system worked. We
> explained to her that this was a significant narcotics crime and
> that if she was found guilty of these things, punishable time
> can be from a range from here to there. We did not tell her
> that's what she was going to get. After talking to her we said
> if you go to prison it's not worth losing your children.

---

[9] The interview room at the Cedar Rapids Police Department was apparently equipped to allow audio recording, but SA Wernli testified that it is the practice of the local drug task force not to record interrogations.

According to SA Wernli, he was trying to convey the point that "by the pure fact of being in prison you don't get to have your children in the cell with you." TFO Moyle testified that it was "commonsensical" that if Rhodes was sentenced to a lengthy term, "she would not have any contact with her children during that time." TFO Moyle denied any discussion regarding the nonexistence of federal prisons in Iowa.

In support of her argument, Rhodes cites *Lynumn v. Illinois*, 372 U.S. 528 (1963), and *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981). In *Lynumn*, the defendant testified at trial that the officers told her that "I could get 10 years and the children could be taken away, and after I got out they would be taken away and strangers would have them, and if I could cooperate he would see they weren't; and he would recommend leniency and I had better do what they told me if I wanted to see my kids again." *Id.* at 531. "The police officers did not deny that these were the circumstances under which" the defendant made the admissions. *Id.* at 532. The United States Supreme Court concluded that the confession was not voluntary, but was coerced.

> It is thus abundantly clear that the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.' These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly 'set her up.' There was no friend or adviser to whom she might turn. She had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.

*Id.* at 534.

In *Tingle*, the Ninth Circuit Court of Appeals concluded that the defendant's confession was involuntary as a result of an officer's statements which were "patently coercive." 658 F.2d at 1336. The officer identified the maximum sentences which the defendant was facing and suggested that she might not see her two-year-old child "for a while." *Id.*

> The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert the "improper influence" proscribed by Malloy.

*Id.* (referring to *Malloy v. Hogan*, 378 U.S. 1 (1964)).

Rhodes also cites *United States v. Alcarez-Mora*, 246 F. Supp. 2d 1146 (D. Kan. 2003). In that case, the Court found that a false statement given by officers during the defendant's questioning rendered his statement involuntary.

> The statements made by law enforcement officers, all of which the court has painstakingly reviewed, do no other than reflect the facts, with one notable exception. The court is concerned about the effect of the statement made early in the interview that the state will take the children away and the parents will "never see them again." The court is unaware whether the latter phrase was intended to convey the fact that if both parents were arrested, the state will have to immediately take the children into state's custody, or to convey that if both parents, as non-citizens, are convicted, they may be deported and never have the same relationship again with their children, or to convey something else. This asserted result of defendant's non-cooperation was stated as a fact, was false, was made early in the interview, and made a lasting impression on the defendant, as evidenced by his or his wife's mention of it throughout their discussion of what to do.

*Id.* at 1154.

The Court believes that all three cases are distinguishable from the instant action. In *Lynumn*, the defendant was "encircled" by three police officers and a twice-convicted felon who had "set her up," she was not given a *Miranda* warning, she was told that her state financial aid would be cut off if she did not cooperate, and that after she got out of prison her children would be taken away and given to strangers. In the instant action, Rhodes was *Mirandized* at the scene of her arrest and again when she arrived at the police department. *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008) (whether a

19

*Miranda* warning was given is a factor to be considered in determining if the statement is voluntary). Rhodes was not told that her children would be "taken away," nor was she told that they would be placed with strangers. *State v. Boggs*, 185 P.3d 111, 122 (Ariz. 2008) (the detective did not threaten the defendant with the loss of his child).

In *Tingle*, the defendant "began to sob" during the interrogation, was "noticeably shaking," and "continued to cry for at least ten minutes," supporting the Court's conclusion that her will had been overborne. 658 F.2d at 1334. In the instant action, there is no evidence that Rhodes lost her composure while being questioned. In addition, she was permitted to call her mother on one or more occasions during the course of the interrogation. The evidence offered at the instant hearing does not support a finding that the officers "deliberately prey[ed] upon the maternal instinct" of Rhodes. Rather, officers responded to Rhodes' questions regarding what would happen to her children. *United States v. Yates*, 479 F. Supp. 2d 1212, 1217 (D. Kan. 2007) ("The officer's statements do not appear calculated to incite or prey upon [the defendant's] maternal responsibilities.").

In *Alcarez-Mora*, the officer told the defendant that "the state will take the children away" and that he would "never see them again." Again, there is no evidence in the instant action that the officers threatened to "take the children away" or told Rhodes that she would never see the children again. The officers told Rhodes that if she went to prison, it would affect her ability to see her children. That observation is hardly surprising and does not render the statement involuntary. *United States v. Cosme*, 484 F. Supp. 2d 194, 200 (D. Mass. 2007) ("The agents did not threaten to take the defendant's children from her but properly warned her that, if she was involved in the robbery, she faced a prison sentence that could result in her being separated from her children.").

While Rhodes was being transported to the police department following her arrest, she asked to contact her mother to make arrangements for the children. The officers allowed her to use SA Wernli's cell phone for that purpose. While being questioned at the police station, Rhodes asked the officers several times "what will happen to my children?"

In response, the officers pointed out the obvious. If Rhodes is convicted and goes to prison, then contact with her children will be affected. Unlike the Court in *Tingle*, the Court does not find the statements to be patently coercive. The Eighth Circuit Court of Appeals has similarly distinguished *Tingle*. *United States v. Abfalter*, 340 F.3d 646, 653 (8th Cir. 2003) ("The police never attempted to threaten [the defendant] with placing his children in foster care, because the context of the statements by the police officers referring to [the defendant's] children and 'foster care' reveals that they were not threats of any sort."); and *United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2003) (The officer's statement that the defendant's children "would be driving by the time he would be released from prison was not unduly coercive.").

Rhodes was twice given a *Miranda* warning before making any incriminating statements at the police station. She does not claim that she was tired or under the influence of drugs or alcohol. There is no evidence that Rhodes is of below average intelligence. The interrogation occurred in the afternoon and while it was relatively lengthy (three hours), there is no evidence that Rhodes was denied food, water, or bathroom privileges. During the course of the questioning, Rhodes was permitted to call her mother at least once. There is no evidence that she requested permission to call on additional occasions and was refused. Rhodes does not claim that the officers were physically threatening or that they raised their voices when questioning her. There is no evidence that Rhodes lost control of her emotions at any time during the questioning. *See Griffith*, 533 F.3d at 984 (identifying some of the factors to be considered in determining if a statement is voluntary).

The only basis for Rhodes' argument that her statements were involuntary is her claim that "improper threats against [her] children" were made by the investigating officers. The Court believes that the officers were credible in testifying that they made no such threats. Rhodes was not told that her children would be taken away, that she would never see her children again, or that they would be placed with strangers. Rather, in

response to questions by Rhodes, the officers pointed out what should have been self-evident; that if Rhodes is convicted and goes to prison, contact with her children will be adversely affected. The Court concludes that the Government has proven by a preponderance of the evidence that the statements made by Rhodes on October 9, 2008 were voluntary. Similarly, the Court concludes that the written permission to search her apartment (Government's Exhibit 4), signed by Rhodes on that date, was voluntary.

## VI. SUMMARY

In summary, the Court believes that Brewer's motion to suppress should be denied. Brewer was properly stopped after he was observed driving a motor vehicle while his license to operate was suspended. He was then arrested on that charge and for failing to yield to pursuing law officers. The subsequent search was properly conducted incident to arrest.

Similarly, the Court believes that Rhodes' motion to suppress should be denied. For the reasons set forth above, the Court believes that there was probable cause to arrest Rhodes in the parkade at Lindale Mall on October 9. Rhodes' subsequent statements were voluntary and constitute a waiver of her Fifth Amendment privilege against self-incrimination.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the District Court **DENY** the Motion to Suppress (docket number 40) filed by Defendant Edward Frank Brewer on December 12, 2008 and **DENY** the Motion to Suppress (docket number 46) filed by Defendant Rosina Orlantha Rhodes on December 16, 2008.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of these proposed findings and recommendations, any party may serve and file written objections with the District Court.

*Defendants are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record*

*the district court judge will need to rule on the objections.* " *Accordingly, if Defendants are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 29, 2008.*

DATED this 5th day of January, 2009.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA